467 So.2d 488 (1985)
TOWN OF LONGBOAT KEY, Florida, Appellant,
v.
Jack M. MEZRAH, Appellee.
No. 84-67.
District Court of Appeal of Florida, Second District.
April 19, 1985.
*489 Scott R. Christiansen of Christiansen, Dehner & Dart, P.A., Sarasota, for appellant.
Henry P. Trawick, Jr., of Trawick, Griffis & Hammersley, P.A., Sarasota, for appellee.
OTT, Judge.
We affirm the trial court's ruling that appellant must allow appellee the use of the property in question for multi-family construction under its R-2 zoning, subject to reasonable requirements and details in accordance with the comprehensive zoning ordinances of the appellant. While not using the magic word of estoppel, we believe the court made findings of fact supported by competent and substantial (in fact practically uncontradicted) evidence and issued directives to the parties in his final judgment that are consistent with the doctrine of equitable estoppel in cases of this type.
In view of the difficult and progressive evolution of the dilemma resulting in the institution of this lawsuit and the final result carved out by the trial judge, we will attempt to delineate the chronology as best we can reconstruct it from the voluminous record.
In December, 1976, appellee purchased the ocean-front land in question. At that time, the property was zoned R-2, which included limited multi-family construction. Certain other sections of the comprehensive zoning ordinances dealt with gulfside setbacks, requiring construction to be set back 150 feet from the mean high water line. Any planned construction encroaching within this 150-foot setback had to be reviewed and approved by the Board of Adjustment. Construction encroaching within the 150-foot setback from the mean high water line was limited by ordinance to single-family dwellings. The mean high water line, at that time, fluctuated due to alternating erosion and beach restoration or nourishment projects (usually in connection with channel or pass dredging). Surveys included in the record on appeal show at least three different mean high water lines at the 1.1-foot elevation above sea level: one dated January 6, 1977; one dated August 31, 1978; and the third dated June 23, 1983. Each survey showed the 1.1-foot mean high water line farther west or seaward out into the Gulf of Mexico of the preceding one. Presumably, this resulted from continuous or ongoing beach nourishment or restoration projects.
About the time of his purchase of the property, appellee was presented with a "Consent to Establishment of Erosion Control Line." This "consent" apparently proposed to establish the 1.1-foot elevation mean high water line pursuant to the January 6, 1977, survey as the State of Florida Erosion Control Line.[1] He executed this on December 26, 1976. On April 27, 1977, after the required number of property owners had executed similar consents, the State of Florida established the January 6, 1977, 1.1-foot level mean high water level survey line as the official erosion control line for the area. Still later, on September 28, 1977, the Florida Department of Natural Resources established (presumably with reference to the now prescribed erosion *490 control line) the coastal construction control line for the beach area involved herein, which was still farther inland.
Chapter 161, Florida Statutes, and Department of Natural Resources regulations set forth detailed construction, engineering, environmental, and beach preservation specifications for all construction proposed between the erosion control line and the coastal construction control line. Prior approval is required for any proposed construction between the two lines. The state requires that planned construction receive local authority approval  such as appellant in this case  before final review by the Department of Natural Resources. The clear purpose of the legislation is to regulate construction seaward of the coastal construction control line, NOT to prohibit it.
In 1978 the appellant adopted ordinance 78-19, which amended the appellant's zoning laws. Insofar as pertinent here, it transferred from the Board of Adjustment to the Town Commission the authority to grant setback variances. In addition, the parties herein have construed this ordinance as authorizing the Town Commission to designate the now official erosion control line as the "mean high water mark" for setback purposes, and the coastal construction control line as the point beyond which no construction would be permitted except by specific variance. Any such construction was again limited to single-family dwellings. The ordinance also required state approval of the planned construction to be secured before a building permit would issue.[2]
In 1978, while all the above was developing, appellee entered into a joint venture with Edson C. Burnett, a registered structural engineer, licensed general contractor, and beachfront developer, for the development of some twenty townhouse units on the property. Mr. Burnett was to procure or prepare all surveys and plans, perform all engineering, secure all governmental approvals, clearances and permits, and construct the project in accordance therewith. He conferred with appellant and was advised that the proposed project would require a variance by the Town Commission with prior approval of the State of Florida Department of Natural Resources for the proposed construction seaward of the state coastal construction control line. In conference with the appropriate staff of the Department of Natural Resources, Mr. Burnett developed surveys and basic construction layouts. The Department of Natural Resources' requirements were worked out over a series of submissions and preliminary approval secured in letter form, conditioned upon compliance with the building and zoning requirements of appellant and subject to final review of the fully developed and approved unit plans and specifications by the state Department of Natural Resources.
Mr. Burnett brought the Department of Natural Resources preliminary approval to the Town Commission. At its request, he brought in a Mr. Truitt of the Department of Natural Resources staff to detail and explain state requirements. After workshop sessions with appellant's staff and the Town Commission, appellee's application for the variance, along with two other similar variances, was formally granted by the Commission at its February 7, 1979, meeting, subject to final site-plan approval, definitive approval of the Department of Natural Resources, and compliance with any conditions imposed by the Department of Natural Resources or town staff. A reading of the transcript of that formal meeting of the Town Commission meeting indicates:
(1) the town had until recently been applying the 150-foot setback requirement for variance from the mean high water line;
(2) it had moved to the erosion control line after it was established;
(3) finally the town had "decided" (under ordinance 78-19) to adopt the State of Florida Coastal Construction Control *491 Line as the line beyond which no construction would be allowed except upon a grant of a variance;
(4) the Town Commission was looking to the state Department of Natural Resources to determine or set construction specifications, encroachment limits, and environmental standards as being more detailed and stringent than their own;
(5) previous variances (previous to the three variances then up for vote) had been granted leaving such specifics largely to the state.
Mr. Burnett thereupon developed detailed designs, plans, and engineering specifications for the project, looking to final site-plan approval by appellant and the Department of Natural Resources. He secured state Department of Transportation approval of the design and engineering for driveways, turnouts, ingress and egress, culverts, and drainage control. He developed plans and secured state approval for the environmental control and beach and vegetation preservation and restoration. Health and Rehabilitative Services' approval was secured for plans and specifications for sewage and water supply and service and storm water control. Preliminary site-plan review was carried on with appellant's staff pursuant to their detailed check lists. By June 20, 1979, the preliminary pre-application review had boiled down to bringing the parking into compliance and then submission to the Town Commission for final site-plan review. The total value or cost of all the plans, engineering and specifications developed by Mr. Burnett after the grant of the variance was set without contradiction at $40,000. Appellee spent an additional $2,341.
On July 11, 1979, pursuant to the petition of an intervenor who owned property across the street and inland from appellee's property, and the complaints of others, the Town Commission voted to rescind appellant's variance and one of the other two (which had, in the meantime, been formally withdrawn by the applicant). The third was allowed to remain since construction had already commenced. In workshop and formal session, the Town Commission was advised by its legal staff that the town ordinances did not provide for the belated petition of the intervenor,[3] nor for rescission of a grant of a variance, and that the extent of appellee's reliance on the variance grant should be determined before taking any such action. Notwithstanding, the workshop session recommended rescission to the formal session, where it passed.
Appellee filed this action on November 11, 1979. At trial in July, 1983, the appellant was still carrying the appellee's property on its tax rolls at an assessed value of $1,470,000 and as zoned for R-2 development. Some time in the early proceedings and apparently on the intervenor's petition (not contained in the record on appeal), the trial court ruled ordinance 78-19 unconstitutional in that it failed to include adequate guidelines pertaining to the authority of the Town Commission to grant variances. That order was not appealed.
Without contradiction, it was established at trial that appellant would not now permit any construction on appellee's property seaward of the coastal construction control line without a variance, and no application for a variance would be entertained except for a single-family dwelling. As far as we can determine, this was set out more specifically by ordinance 80-8, adopted by appellant on November 19, 1980, after the trial court had declared ordinance 78-19 unconstitutional.
The surveys showed the eastern property line of appellee's property almost coincided with the coast construction control line, so that all of his property, practically speaking, lay west or seaward of the coastal construction control line. There is approximately 255 feet between the coastal construction control line and the erosion control line. At the time of trial, the mean *492 high water line  according to the survey line of June 23, 1983  was from 125 feet (at the south end of appellee's property) to 265 feet (at the north end) still farther seaward (or west) of the erosion control line.
The testimony at trial established that the proposed project was consistent with that permitted by the State of Florida and posed no threat or problem to the beach, the environment, or the community.
Upon the above state of facts, the trial court found that appellant's Town Commission had, albeit under an ordinance it had ruled unconstitutional, granted a variance for appellee's proposed project that was within the applicable R-2 zoning; that the earlier ruling of unconstitutionality of the ordinance and subsequent amendment thereof could not benefit the appellant; that the action of appellant in rescinding the variance (or refusing further consideration of the site plan for the proposed development) was a purely political response not based on any unsuitability of the project; that the proposed construction must meet state construction and environmental standards and safeguards; that denial of such a development would be a denial of any reasonable use of his land without due process; that a hardship was created by law and appellant's action; that appellee and/or his joint venturer in his behalf had, in reliance on the variance, expended large sums of money together with time and effort in developing plans, obtaining various local and state permits or approval of various aspects of the project. From our reading of the record, we cannot say that his findings are not supported by competent and substantial evidence.
In Town of Largo v. Imperial Homes Corp., 309 So.2d 571, 572-573 (Fla. 2d DCA 1975), this court enunciated the rule applicable to the case before us:
The doctrine of equitable estoppel is applicable to a local government exercising its zoning power when a property owner
(1) relying in good faith
(2) upon some act or omission of the government
(3) has made such a substantial change in position or incurred such extensive obligations and expenses
that it would be highly inequitable and unjust to destroy the rights he had acquired. [Citations omitted.]
The issue in Town of Largo is the one we find crucial to this case, that is, whether the reliance by the developer (appellee) was substantial enough to support estoppel.
Based upon the findings made by the trial court, amply supported by the record, which we have summarized above, we hold that appellant is estopped from denying appellee the right to proceed under the grant of variance. Appellee (and his joint venturer) relied in good faith upon the grant of variance by appellant, expending substantial and valuable time and energy in an effort to comply with the many state and local governmental requirements. Appellee can invoke the doctrine of equitable estoppel despite the fact that he had not yet obtained building permits or made physical changes to the land. Id. at 573. We feel that to allow appellant to rescind the variance at this stage would be "highly inequitable and unjust."
The decision of the trial court is AFFIRMED.
GRIMES, A.C.J., and CAMPBELL, J., concur.
NOTES
[1] The consent refers to a survey which is not in the record on appeal.
[2] Obviously, either the state or the town would ultimately have to yield to the other as to "final" approval since they each proposed to require prior approval by the other.
[3] The intervenor had been heard in the earlier workshop sessions and the formal session of February 7, 1979.